Total Page Count: 43

Collin James Vierra (SBN 322720)
EIMER STAHL LLP
99 S. Almaden Blvd., Ste. 600
San Jose, CA 95113-1605
Telephone: (408) 889-1668
Email: cvierra@eimerstahl.com

*Attorney for Plaintiffs Robert Arntsen,*
*Mary Lee, Arntsen Family Partnership, LP,*
*Brian Christopher Dunn Custodianship,*
*John Ho, Quanyu Huang*

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

## SACRAMENTO DIVISION

| | |
|---|---|
| In re: DAVID MATTHEW BRAGG,<br><br>Debtor. | Case No. 22-22700<br><br>Adv. Proc. No. |
| ROBERT ARNTSEN, MARY LEE, ARNTSEN FAMILY PARTNERSHIP, LP, BRIAN CHRISTOPHER DUNN CUSTODIANSHIP, JOHN HO, and QUANYU HUANG,<br><br>Plaintiffs,<br><br>vs.<br><br>DAVID MATTHEW BRAGG,<br><br>Defendant. | Chapter 7<br><br>**ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6), AND FOR JUDGMENT IN FAVOR PLAINTIFFS** |

## COMPLAINT

1.      Plaintiffs Robert Arntsen, Mary Lee, the Arntsen Family Partnership, LP, the Brian Christopher Dunn Custodianship, John Ho, and Quanyu Huang (collectively, "Plaintiffs") bring this adversary proceeding pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6) to obtain a judgment against David M. Bragg and to determine dischargeability of debt.

2.      This adversary proceeding is brought in connection with Defendant's case No. 22-22700 under Chapter 7 of Title 11 of the United States Code, now pending in this Court.

## <u>INTRODUCTION</u>

3.      It is axiomatic that the "principal purpose of the Bankruptcy Code is to grant a fresh start to the honest but unfortunate debtor." *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 367 (2007). The debtor here, however, is neither honest nor unfortunate. On the contrary, Bragg defrauded Plaintiffs out of over $1 million through a brazen series of deliberate lies, misrepresentations, and breaches of fiduciary duties while misappropriating investor funds to enjoy a lavish lifestyle.

4.      Bragg first induced Plaintiffs to invest in a real estate project called the Moore Road Project by lying about the past performance of his company, Silicon Valley Real Ventures ("SVRV"). Although previous SVRV projects had lost significant amounts of money, Bragg told Plaintiffs that those projects had been smashing successes. He further deceived Plaintiffs by presenting them with operating agreements that he represented would govern the terms of their investments in the Moore Road Project, only

ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

to secretly rewrite the operating agreements to erase Plaintiffs' ownership interests in the LLCs operating the project. He later solicited loans from two of the Plaintiffs by representing that the money was needed to procure additional funds for the Moore Road Project even though he intended to use (and did use) Plaintiffs' money for an entirely unrelated project that was running nearly $900,000 short of its projected return. He told Plaintiffs that these loans would be prioritized over all other investments in the Moore Road Project and would be repaid promptly with 12% interest. And then, when the Moore Road Project was on the verge of failing, he induced Plaintiffs to lend *additional* funds to keep the project afloat with the promise that these loans would likewise be prioritized and repaid with 12% interest.

5.     All of this was a lie. Unbeknownst to Plaintiffs, Bragg, acting as the manager of the Moore Road LLCs, had secretly signed a deal with another investor that purported to deprive Plaintiffs of *any* interest in the properties. And instead of paying back Plaintiffs' loans, he redirected Plaintiffs' money into his own pockets and those of his business partner.

6.     As a result of Bragg's egregious fraud, Plaintiffs lost the entirety of their investments/loans, even though Bragg's secret dealing allowed a later investor in the Moore Road Project to make a profit of over $300,000 when the properties were sold in 2020. Bragg convinced that investor to allow him to take a $75,000 commission on the sale in exchange for an agreement that Plaintiffs would not receive *anything* from the sale of the properties.

-3-

ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

7.     In addition to defrauding Plaintiffs through brazen misrepresentations and flagrant breaches of his fiduciary duties, Bragg also misappropriated hundreds of thousands of dollars from Plaintiffs' investments and loans to personally enrich himself. He used Plaintiffs' funds to pay rent on his pricey, 5-bedroom, 5-bathroom Atherton home, lease a high-end Mercedes and Ford F–250 (among other vehicles), purchase a boat, pay for storage of that boat and his vintage Cadillac at a luxury car storage facility, write checks to himself, pay hundreds of thousands of dollars to his brother, and much more. None of this was properly accounted for. In short, Bragg improperly used Plaintiffs' investments to enrich himself while simultaneously selling out their interests in the Moore Road Project.

8.     Because Chapter 7 was not intended to benefit conmen like Bragg, this Court should declare Bragg's debts to Plaintiffs nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6). The Court should also issue a judgment in Plaintiffs' favor on their fraud and breach of fiduciary duty claims and award Plaintiffs compensatory and punitive damages, prejudgment interest, and attorneys' fees and costs.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. § 727(c). This Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

10.     Venue is proper under 28 U.S.C. § 1409(a).

11.     This Adversary Proceeding relates to *In re David Matthew Bragg*, No. 22-22700-B (Bankr. E.D. Cal.) now pending in this Court (the "Bankruptcy Case"). Plaintiffs

-4-

ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

hold general unsecured claims against the Debtor for fraud, breach of fiduciary duty, and other misconduct related to Plaintiffs' investments in (and loans to) a real estate project Bragg managed involving two parcels of property in Woodside, CA: 385 Moore Road, and 387 Moore Road. The project is known as the Moore Road Project. Plaintiffs Robert Arntsen, Mary Lee, the Arntsen Family Partnership, LP, and the Brian Christopher Dunn Custodianship filed a complaint in San Mateo Superior Court against Bragg and several co-defendants on March 15, 2022, asserting claims for, *inter alia*, fraud and breach of fiduciary duty. A copy of that Complaint, styled as *Robert Arntsen, et al. v. Davis, et al.*, No. 22-CIV-01148 (Cal. Super. Ct., San Mateo Cnty.) (the "*Arntsen*" litigation), is attached and incorporated as Exhibit A. Plaintiffs sought roughly $750,000 in compensatory damages as well as punitive damages. Bragg failed to answer the Complaint and the Court entered a default against Bragg on June 29, 2022, which is attached as Exhibit B.

12.     Plaintiffs filed a First Amended Complaint ("FAC") on August 22, 2022, adding additional defendants and factual allegations, which is attached as Exhibit C. Plaintiffs subsequently informed Bragg's counsel that they would file a Second Amended Complaint adding John Ho's and Jacky Huang's claims. The parties thus stipulated to extend the deadline for Plaintiffs to respond to the FAC to October 21, 2022. But instead of filing any response to the FAC, Bragg instead filed the bankruptcy petition underlying this Adversary Proceeding on the day his response was due.

ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

## PARTIES

13.     Plaintiff Robert "Bob" Arntsen ("Bob"), on behalf of himself and his daughter, Jennifer Arntsen, both directly and indirectly through the Arntsen Family Partnership, LP invested or loaned several hundred thousand dollars with, and was defrauded by Bragg, and was damaged thereby. Bob resides in Sunnyvale, California.

14.     Plaintiff Arntsen Family Partnership, LP (the "Partnership") invested or loaned several hundred thousand dollars with, and was defrauded by, Bragg, and was damaged thereby. The Partnership is managed by Martha Dunn, who lives in Woodside, California.

15.     Plaintiff Mary Lee ("Mary") invested or loaned over $100,000 with, and was defrauded by, Bragg, and was damaged thereby. Mary lives in Camarillo, California.

16.     Plaintiff Brian Christopher Dunn Custodianship (the "Custodianship") invested $30,000 with, and was defrauded by, Bragg, and was damaged thereby. The trustee of the Custodianship is Martha Dunn, who lives in Woodside, California.

17.     Plaintiff John Ho ("John") invested or loaned over $100,000 with, and was defrauded by, Bragg, and was damaged thereby. John lives in Santa Clara, California.

18.     Plaintiff Quanyu "Jacky" Huang ("Jacky") invested or loaned over $100,000 with, and was defrauded by, Bragg, and was damaged thereby. Jacky lives in Fremont, California.

19.     David "Dave" Bragg ("Bragg") is the debtor in the Bankruptcy Case now pending before this Court. Bragg resides in Granite Bay, California.

ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

## COURSE OF PROCEEDINGS AND DEBTOR'S CONDUCT GIVING RISE TO THE NONDISCHARGEABLE DEBT

20.     Around 2014, Bragg and his co-managing partner, Kurtis S. Kludt ("Kludt"), asked Bob to invest in their company, Silicon Valley Real Ventures, LLC ("SVRV"). After speaking with Bragg, Bob made his first investment with SVRV through a Custodian Individual Retirement Account (IRA) in the amount of approximately $152,500 in or around January 2015. For this investment, Bragg signed a written agreement promising Bob a 50% "preferred return." Bragg also promised Bob "quarterly email updates on the progress of [] SVRV until 1.5 return of investment has been fully paid to you." One of the projects Bragg was managing at that time was known as "SVRV Land."

21.     On or around December 14, 2017, Bragg told Bob that the SVRV Land project would soon sell for a substantial profit, and he asked if Bob would prefer that his proceeds from the project be reinvested into a new project with SVRV. The new project involved the development of two parcels of land at 385 Moore Road and 387 Moore Road, in Woodside, California (hereinafter the "Moore Road Project" or the "Project"). Bragg told Bob that the Project would have similar upside to the SVRV Land project. However, as Plaintiffs have recently discovered, the SVRV Land project did *not* return enough to repay even the initial equity investments of many investors, including Bob. If Bragg had been honest with Bob about the result of the SVRV Land project (i.e., that it did not return enough money for Bragg to repay Bob's initial investment, let alone a 50% preferred return), neither he nor any of his family members would ever have invested another dime with SVRV.

ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

22. Bragg's plan for the Moore Road Project was to purchase two parcels of undeveloped land, design—and perhaps develop—a luxury residence on each parcel, obtain permits, and then sell both parcels for a profit. In or around late November or early December 2017, Bragg signed a Letter of Intent with the owner of the properties, under which Bragg agreed to pay $250,000 in January 2018 for an option to purchase the Moore Road properties for $4,500,000 later in the year.

23. Bob agreed to roll his proceeds from the impending SVRV Land sale into the new Moore Road Project. However, Bragg needed an additional, substantial deposit to get the Moore Road Project underway. Given his trust in Bragg, and Bragg's assurance that Bob's investment in the SVRV Land project had been profitable, Bob reached out to several of his family members about investing in the Moore Road Project. On the understanding that Bob's prior investment in the SVRV Land project had been profitable, they agreed to invest.

24. Bragg followed up with further details about the Moore Road Project on or around December 13, 2017. Bragg informed Bob that because the proceeds from the SVRV Land project were not yet available, he would need a collective $150,000 deposit from Bob and his family members. In addition, Bragg would seek to raise another $300,000 to $350,000 to pay for architects, engineers, consultants, and a temporary road to the property. Bragg asked Bob to "get me [your family's] email addresses" and inquired "[h]ow much . . . you and [your] family [can] commit to put this property into escrow next week?" Bob subsequently put Bragg in contact with his sisters, Martha—who manages the Partnership and the Custodianship—and Mary. On or around December 14, 2017, Bragg repeated this

-8-

ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

information to Martha. Bragg also falsely told Bob and Martha that SVRV had committed equity to the Project, "and if needed can commit more." In fact, SVRV never committed *any* of its own money to the Moore Road Project.

25. On or around Thursday, December 14, 2017, Bragg followed up with Bob and said he "expected to close escrow" on the SVRV Land sale on January 22, 2018, but would "need to fund $250K by Monday or Tuesday next week for the [d]eposit" for the Moore Road Project, of which he currently had only "$125k ready to go." "After that," Bragg said, "we can populate the rest of the investment."

26. On or around December 19, 2017, Bragg signed a Purchase Agreement for the properties pursuant to the earlier Letter of Intent. In so doing, he paid $250,0000 for an option to purchase the properties for an additional $4,250,000 by no later than November 30, 2018.

27. Bragg scheduled an investor meeting for December 20, 2017, which was attended by Bob, Martha, and two other possible investors—the Geyers—who had a connection to the current owners of the Moore Road properties. At this meeting, Bragg discussed plans for the Moore Road Project and discussed his urgent funding needs.

28. On or about that same day, the Partnership invested $150,000 in the Moore Road Project, becoming the first investor in the Project.

29. On or around December 27, 2017, Bragg used the Partnership's investment to pay $125,000 to Lawyer's Title for title insurance on the properties.

30. On or around January 2, 2018, the Geyers transferred $125,000 to SVRV for the Project.

-9-

### Bragg's Partner Shares the Effective Operating Agreements with Plaintiffs and Bragg Creates the Moore Road LLCs

31.     In or around February 2018, Bragg's business partner, Kludt, prepared investment and operating agreements for the limited liability companies that would become the Moore Road LLCs. On or around February 19, 2018, Bragg informed Bob that due diligence for the Project had been completed. He stated that they were ready to "release the deposit and get the next phase rolling [to] keep our schedule." He also informed Bob that the investment and operating agreements Kludt had drafted "match[ed] the terms discussed and presented" for the Project.  He also wrote, "Keep in mind that we still have not formed the project LLCs and will do so once we release deposit."

32.     On or around February 27, 2018, Kludt emailed Bob and Martha the Operating Agreements (hereinafter, the "Effective Operating Agreements") for the Moore Road LLCs, explaining that "[y]ou and Martha are the majority owners with SVRV." While the Effective Operating Agreements made Bragg the Manager of the Project, they reserved certain rights to Bob and Martha (as manager of the Partnership) as Members. Among other things, the Effective Operating Agreements required "unanimous approval of the Members in a consent in writing" for:

- "the admission of a new Member or a change in any Member's Membership Interest, Ownership Interest, Percentage Interest, or Voting Interest";

- "[a]ny other act outside the ordinary course of the Company's activities"; and

- "[t]he amendment of th[ese] Agreement[s]."

-10-

ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

33.     The Effective Operating Agreements also stated that net profits would be distributed first to Passive Members, and after they had recovered their capital contributions, then to all Members in proportion to their Membership Interests. "Active Members" were defined as those "whose ownership interests are derived from project management," and "Passive Members" as those "whose ownership interests are derived from capital investments." Bob and the Partnership, as well as any later-investing Plaintiffs who were not managers, would be Passive Members, entitled to the first distributions from the Project. SVRV was the sole Active Member.

34.     The Effective Operating Agreements stated explicitly that "no Member"—including both Active and Passive Members—would be "entitled to remuneration for services rendered." This provision made sense since the Effective Operating Agreements gave SVRV a 30% ownership interest in the Moore Road LLCs even though neither SVRV nor Bragg was contributing any capital to the Project. Under the terms of the Effective Operating Agreement, SVRV (and thus Bragg) would make money only if the Project generated a profit.

35.     On March 29, 2018, after reviewing the Effective Operating Agreements, the Geyers withdrew their $125,000 investment in the Project. The Geyers objected to SVRV taking a 30% equity stake in the Moore Road LLCs.

36.     Plaintiffs, by contrast, consented to the terms of the Effective Operating Agreements. Although those agreements were never signed, the parties unmistakably agreed to their terms and acted in reliance on them. For example, on or around March 1, 2018, Bragg began making construction-related expenditures for the Project using the

-11-
ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

funds committed by the Partnership, including paying tens of thousands of dollars for architectural work. On information and belief, between March and November 2018, SVRV spent approximately $165,000 on additional development costs for the Project. These expenditures were funded entirely by Plaintiffs' investments.

37.     On or around June 8, 2018, the Partnership invested an additional $100,000 in the Project. This investment was made in reliance on the agreement between the parties reflected in the Effective Operating Agreements.

38.     On or around June 8, 2018, the Custodianship invested $30,000 in the Project. This investment was made in reliance on the agreement between the parties reflected in the Effective Operating Agreements.

39.     On or around June 13, 2018, Bragg registered SVRV 387 Moore, LLC with the California Secretary of State.

40.     On or around June 25, 2018, Bob invested $30,000 in the Project on behalf of his daughter Jennifer. This investment was made in reliance on the agreement between the parties reflected in the Effective Operating Agreements.

41.     On or around June 30, 2018, Mary invested $100,000 in the Project. This investment was made in reliance on the agreement between the parties reflected in the Effective Operating Agreements.

42.     On or around July 18, 2018, Bragg informed Plaintiffs that he had "formed two LLCs" but was still "awaiting paperwork" for SVRV 385 Moore, LLC.

43.     By this time, Bob, the Partnership, Mary, and the Custodianship were still the sole investors in the Moore Road Project and there had been no amendments to the

-12-

ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

Effective Operating Agreements, leaving Plaintiffs the sole Passive Members of the LLCs. Accordingly, pursuant to the agreement of the parties and California law, the Effective Operating Agreements took effect upon registration of the Moore Road LLCs and became the governing documents for the operation of those LLCs.[1]

44.　On or around August 29, 2018, Bragg contacted Bob, Martha, and Mary to inform them that "[w]e are ready to process the investor agreements and need to verify the specifics for the agreements and how the amounts will be allocated." Bragg said that he and Bob "need[ed] to meet live soon and finalize the amount to roll [over] from the [SVRV Land] investment." Bob agreed that Bragg could roll all of Bob's proceeds from the SVRV Land project into the Moore Road Project, which proceeds, according to Bragg, amounted to $205,000.

45.　Bragg was contemporaneously soliciting an investment from John. On July 26, 2018, John agreed to invest $100,000 in the Project. Kludt presented John with different operating agreements from the Effective Operating Agreements that had been presented to Bob, the Partnership, Mary, and the Custodianship. Neither Bragg nor Kludt shared these

---

[1] *See* Cal. Sec'y of State, Starting a Business – Limited Liability Company (LLC), https://www.sos.ca.gov/business-programs/business-entities/starting-business/types#llc ("[A]n operating agreement among the members as to the affairs of the LLC and the conduct of its business is required. The LLC does not file the operating agreement with the Secretary of State but maintains it at the office where the LLC's records are kept."); Cal. Corp. Code § 17701.13(d)(5) (requiring LLCs to maintain a copy of their operating agreements); Cal. Corp. Code § 17701.11 ("Two or more persons intending to become the initial members of a limited liability company may make an agreement providing that upon the formation of the limited liability company the agreement will become the operating agreement."); Cal. Corp. Code § 17704.01(b) ("If a limited liability company is to have more than one member upon formation, those persons become members as agreed by the persons before the formation of the limited liability company.").

-13-

ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

operating agreements with Bob, the Partnership, Mary, or the Custodianship. On or around October 18, 2018, John invested $100,000 in the Moore Road Project.

46.     Thus, including Bob's anticipated rollover, Plaintiffs invested approximately **$715,000** in the Moore Road LLCs in 2017 and 2018.

### Bragg Systematically Misdirects Plaintiffs' Investments and Drains Assets from SVRV for His Personal Use

47.     Plaintiffs unmistakably designated their investments toward the Moore Road Project, and the Moore Road LLCs each had their own bank accounts. Nevertheless, Bragg deposited Bob's, the Partnership's, Mary's, and the Custodianship's funds into SVRV's main bank account. This account was used to pay expenses for several other projects that Plaintiffs had not invested in (and in many cases did not even know about). Documents produced during discovery in the *Arntsen* matter indicate that Bragg misdirected hundreds of thousands of dollars invested in the Moore Road Project to other projects in which he personally had a financial stake but Plaintiffs did not.

48.     Bragg also paid himself and SVRV for his purported services to the Project, notwithstanding the provisions in the Effective Operating Agreements prohibiting such payments.

49.     Most egregious, however, was Bragg's consistent misuse of corporate funds to pay personal expenses. Documents uncovered in the *Arntsen* matter demonstrate that Bragg transferred hundreds of thousands of dollars from the Moore Road LLCs to SVRV's bank account, and often, in turn, to the bank account of another of his companies, Silicon Valley Real Estate Ventures ("SVREV"), treating these companies as his alter egos. He

then used SVRV's and SVREV's funds, which included Plaintiffs' investments, for (1) rent on his personal residence in Atherton, California ($12,000 per month); (2) the lease on his personal Mercedes ($1,173.45 per month); (3) to purchase two Gator utility vehicles; (4) to purchase a Humvee; (5) to purchase numerous other vehicles and construction equipment; (6) to store his personal boat and vintage Cadillac at a luxury car storage facility called Autovino; (7) a pricey Verizon phone and internet plan that included his family (over $1,500 per month as of November 2017); (8) to remodel a house his sister owned in Solvang, California; (9) to remodel a house on which he held a personal purchase option in Atherton, California; (10) to pay interest on a personal loan owed to his brother (typically $3,000–$6,000 per month); (11) to pay his membership with Vistage Worldwide (approximately $15,000 spent between 2014 and 2015); (12) to pay for a private charter flight membership with Surfair (up to $2,800 per month); and (13) much more.

50.     Beyond that, Bragg issued checks directly to himself from SVRV's accounts. Some of these were labeled "partner draw," others indicated that they were expense reimbursements (though the numbers were almost always perfectly round, and documents uncovered in the *Arntsen* matter have failed to turn up receipts that might justify these payments), and some had nothing in the memo line at all. Between March 2018 and February 2020, Bragg wrote checks to himself from SVRV's and SVREV's accounts totaling over $85,000. Between March 2018 and February 2019, he used SVRV's and SVREV's funds to pay over $100,000 in Capital One credit card bills. Between February 2017 and November 2019, he withdrew over $500,000 in cash and in other teller transactions from SVRV and SVREV. Between 2015 and 2020, he paid $233,955.58 in

-15-

ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

interest to his brother for a personal loan, not including a $1 million principal payment in June 2018 and a $550,000 principal payment in April 2019. In short, Bragg treated his investors' funds like his own private piggy bank to fund an opulent lifestyle that included expensive houses, cars, boats, motorbikes, wine, vacations, and more, and to pay debts he had personally incurred.

**Bragg Conspires with Other Investors to Unlawfully Amend the Effective Operating Agreements and Eliminate Plaintiffs' Interest in the Moore Road Project**

51. In or around September 2018, Bragg began negotiating with the managers of an investment company called Paramont Capital LLC to obtain more capital for the Moore Road Project. Bragg never told Plaintiffs about these negotiations, even though their approval would be necessary to allow additional members to invest. In November 2018, Paramont Capital's managers, Gregory Davis ("Davis") and Jason Justesen ("Justesen"), flew to California to meet with Bragg in person.

52. Among the documents shared with Davis and Justesen were the operating agreements for the Moore Road LLCs that Bragg had shared with John but not with Bob, the Partnership, Mary, or the Custodianship. These operating agreements differed significantly from the Effective Operating Agreements, which had gone into effect upon registration of the Moore Road LLCs in June and July 2018. However, even these purported operating agreements specified that they could be amended only with the unanimous consent of the members, which would have included John, Bob, the Partnership, Mary, and the Custodianship.

-16-

53.     In or around November 2018, Bragg also secured two 12-month loans for the Moore Road LLCs from Genesis Capital, LLC ("Genesis"). The Genesis loans were secured with two three-month extensions built in for a fee. Together, the loans were for approximately $3,000,000. The loans were personally guaranteed by Bragg and by Kludt's father, Kim.

54.     On or around November 27, 2018, Davis formed Paramont Woodside LLC. On or about the same day, Bragg and Davis unlawfully purported to amend the Effective Operating Agreements for the Moore Road LLCs by replacing them with new operating agreements. Paramont's counsel drafted new operating agreements (the "Unapproved Operative Agreements"), and Bragg signed them on behalf of SVRV without Plaintiffs' knowledge or consent. *Plaintiffs were not even made aware of the Unapproved Operating Agreements or informed that they had been signed for another seven months*.

55.     Although by this time Bragg had been operating the Moore Road LLCs for approximately five months pursuant to the terms of the Effective Operating Agreements and Plaintiffs had funded both the Purchase Agreement and all development of the properties through their investment of approximately $715,000 in the Moore Road Project, the Unapproved Operating Agreements that Bragg secretly signed with Davis purported to give Plaintiffs *no* membership interest in the Moore Road LLCs. Instead, the Unapproved Operating Agreements listed SVRV and Paramont Woodside as the *only* "Initial Members" of each of the Moore Road LLCs. SVRV was listed as having contributed 20% of the initial capital in the amount of $250,000 for each property, and Paramont was listed as having contributed the remaining 80% in the amount of $1,000,000 for each property. None of the

-17-
ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

Plaintiffs was listed as having ***any percentage interest*** in the Project. In fact, neither the Plaintiffs nor their substantial investments were mentioned anywhere in the Unapproved Operating Agreements.

56.     Plaintiffs never would have consented to such wholesale amendments to the Effective Operating Agreements, which is likely why Bragg kept the existence of the Unapproved Operating Agreements hidden from Plaintiffs for more than seven months.

57.     The Unapproved Operating Agreements committed Paramont Woodside to invest $2,000,000 in the Moore Road Project in 2018. They also committed SVRV to making an Initial Capital Contribution of $500,000 in 2018 and a Subsequent Capital Contribution of $221,000 by February 1, 2019. The $500,000 included expenses Bragg had already incurred on the Project—all of which were funded by Plaintiffs.

58.     Bragg's unilateral decision to sign Unapproved Operating Agreements with Paramont Woodside was a clear breach of his fiduciary duties as manager of the Moore Road LLCs, and a violation of the terms of the Effective Operating Agreements, which required unanimous written consent from Plaintiffs. And his solicitation of hundreds of thousands of dollars from Plaintiffs based on his representation that the Moore Road Project would be governed by the terms of the Effective Operating Agreements—when in fact he planned to misappropriate Plaintiffs' funds and sign away their interest in the Moore Road LLCs—was fraud, plain and simple.

59.     On or about November 30, 2018, Bragg, using the proceeds from the Genesis loan and the investments from Plaintiffs and Paramont Woodside, finalized the purchase of 385 Moore Road and 387 Moore Road and paid the sellers the remaining $4,250,000.

-18-

### Bragg Fraudulently Solicits $200,000 in Loans from Bob and the Arntsen Partnership

60.     On February 1, 2019, SVRV failed to make the $221,000 Subsequent Capital Contribution for the Moore Road Project, which put it in breach of the Unapproved Operating Agreements. Bragg, who had still not even informed Plaintiffs that these Unapproved Operating Agreements existed, also declined to inform Plaintiffs of this breach.

61.     Instead, on or around March 19, 2019, Bragg met with Bob and Martha and told them that he needed an additional $200,000 to keep the Moore Road Project going. Specifically, he said he needed $200,000 from Plaintiffs to help secure a $2,000,000 investment in the Project from Paramont. Bragg said he could not use Bob's rollover money because now it was tied up in the SVRV 631 Beach project. He asked Plaintiffs to extend $200,000 in the form of short-terms loans that would be promptly repaid with 12% interest. Bragg told them that Paramont simply needed to see that this money was available before they invested in the Project.

62.     **That was a brazen lie.** As discussed above, unbeknownst to Plaintiffs, Paramont had *already* invested $2,000,000 in the Project in November 2018, and the Moore Road LLCs had already used those funds to purchase the properties. But because Bob and Martha trusted Bragg and were unaware of his dealings with Paramont, Bob extended a loan of $100,000 for the Project on or around March 19, 2019, and the Partnership extended a loan of $100,000 on or around March 20, 2019. SVRV's internal accounting records identified these transfers as "short term loan[s]" in a file titled "money

-19-
ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

raised for moore." With respect to the investment from his personal account, Bob wrote, "FOR SVRV M[O]ORE RD" in the memo line of his check and recorded the payment in his checkbook with the memorandum "SVRV/Moore Road."



**Figure 1**

63. These funds were *never transferred to the Moore Road LLCs*. Instead, Bragg deposited Plaintiffs' funds into SVRV's main bank account and used them to pay for expenses related to the SVRV 631 Beach project, which was about to close. This was a clear misappropriation of funds in violation of the parties' agreement.

64. For over a month, Bragg refused to follow up about the loans. Bragg finally told Bob and Martha that he would repay them once the SVRV 631 Beach project closed (though he did not tell them that their loans had been used for that project). Meanwhile, because the SVRV Land deal had cratered, Bragg gave Bob an ownership interest in SVRV 631 Beach equivalent to his initial investment in SVRV Land. However, unbeknownst to Bob, no money was rolled over from SVRV Land to SVRV 631 Beach. Instead, on information and belief, Bragg simply allocated membership units in SVRV 631 Beach to

Bob, which was likely a violation of the operating agreement governing that project. Bragg told Bob that his funds would finally be rolled over into the Moore Road Project once the SVRV 631 Beach project closed.

65.     On or around April 26, 2019, Bob wrote to Bragg, saying, "Now that Beach has closed are you going to be rolling my funds over to the Moore Road projects and returning both my extra and the Arntsen Partnership extra money back to us?" Bob also wrote, "We are still waiting for the paperwork for the Moore Road investment so that all of the family investors know what is happening. This is something that needs to be taken care of right away."

66.     Bragg responded that the SVRV 631 Beach project had "hit a snag," but that it would close soon. He ignored Bob's other questions.

67.     The SVRV 631 Beach project closed on or around April 30, 2019, for $4,795,000.[2] Soon thereafter, over $450,000 was wired directly from SVRV 631 Beach to SVRV.

68.     Bragg still declined to follow up with Bob and the Partnership about their loans, prompting Martha to contact Bragg again on or around May 6, 2019, writing, "I understand the property closed last week. I would like to pick up the checks for Bob and myself. Please call me to arrange[] for that."

69.     An internal ledger showing the results of the SVRV 631 Beach project obtained during the *Arntsen* litigation shows that SVRV only had $103,641 left to pay back

---

[2] https://www.zillow.com/homedetails/631-Beach-Dr-Aptos-CA-95003/95279906_zpid/.

ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

Bob and the Partnership—far short of their $200,000 principal, let alone 12% interest. Bragg also lost the entirety of Bob's $205,000 rollover. Bragg hid this information from Bob and Martha.

70.     On or around May 10, 2019, Bragg repaid the Partnership's $100,000 loan but failed to pay any interest. **But Bragg returned to Bob only $3,641 of his $100,000 loan**, and further failed to pay any interest. **Bob's loan still has not been repaid.** And neither Bob nor the Partnership has been paid interest, of which over **$40,000** on these loans has accrued to date. Bragg also failed to roll over *any money* from Bob's initial investment into the Moore Road Project, even though Bragg had led Bob to believe that his initial investment of $152,500 had grown to $205,000 under Bragg's management.

### Bragg Finally Discloses the Unapproved Operating Agreements Seven Months After They Were Signed

71.     In or around June 2019, Bragg finally disclosed the Unapproved Operating Agreements and purported Investment-Subscription Agreements to Plaintiffs. The purported Investment-Subscription Agreements contemplated investments into each of the Moore Road LLCs on or before January 15, 2019 or earlier, i.e., at least five months prior, including $200,000 total from Bob, $250,000 total from the Partnership, $100,000 total from Mary, $100,000 total from John, and $30,000 total from the Custodianship.

72.     In purporting to set forth the distribution of proceeds upon sale of the properties, the purported Investment-Subscription Agreements invoked the Unapproved Operating Agreements. The "Distribution Waterfall" in the purported Investment-Subscription Agreements purported to require **first,** a Preferred Return for Additional

ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

Capital Contributions made by Members; **second,** the principal for such Additional Capital Contributions; **third,** a Preferred Return to Paramont Woodside based on its Initial Capital Contribution; **fourth,** the principal of Paramont Woodside's Initial Capital Contribution; **fifth,** a Preferred Return for SVRV's Initial Capital Contribution and Subsequent Capital Contributions; **sixth,** the principal of SVRV's Initial Capital Contribution and Subsequent Capital Contributions; **seventh,** a distribution of 20% to SVRV and 80% to the Members in proportion to their ownership interests until Paramont had recovered all Capital Contributions plus a 70% return; and **eighth,** remaining distributions to SVRV and the Members, with the proportion for the distributions dependent on whether the Project was completed within one year.

73. The purported Investment-Subscription Agreements and Unapproved Operating Agreements did not even mention Plaintiffs. And to the extent Plaintiffs' investments were reflected in SVRV's Initial Capital Contribution, the Unapproved Operating Agreements purported to relegate Plaintiffs to the bottom of the Distribution Waterfall—all this despite the facts that Plaintiffs were the *first* investors in the Moore Road Project, and the entire Project would have been impossible without their having invested hundreds of thousands of dollars in the Project before Paramont even got involved.

74. Plaintiffs refused to sign either the purported Investment-Subscription Agreements or the Unapproved Operating Agreements because they were flatly inconsistent with the terms of their initial investments and the Effective Operating Agreements that had gone into effect upon registration of the Moore Road LLCs in mid-2018.

-23-

**Bragg Ceases Communications with Plaintiffs While SVRV Flounders**

75.     Starting in or around July 2019, SVRV's communications with Plaintiffs dried up. Bob reached out to Bragg repeatedly to inquire about the Project's progress to no avail. Bob was particularly concerned with how long it seemed to be taking for the Project to proceed. Bob began to think it would make more sense to sell the properties without developing them. This might reduce available profits, but it would almost certainly guarantee a return of principal and some profit at substantially reduced risk. Plaintiffs tried to raise this proposal with Bragg repeatedly without success.

76.     Throughout 2019, Davis and Kevin Wolfe (another of Paramont Capital's managers) repeatedly demanded that Bragg provide them with relevant financial information regarding the Project, including so that they could prepare valid tax returns. From Bragg's responses, Davis and Wolfe became aware that SVRV was not keeping proper books and records and was conducting improper accounting for the Project.

77.     On or around November 5, 2019, Paramont Woodside gave SVRV notice that SVRV had breached the Unapproved Operating Agreements by failing to make the required Subsequent Capital Contribution nine months earlier, i.e., by February 1, 2019.

**Bragg Solicits Jacky's Investment**

78.     As the end of 2019 approached, given Bragg's failure to sell the properties, Bragg needed to extend the loans with Genesis. Those extensions required paying an approximately $15,000 fee *and* $19,500 monthly interest payments beginning in January 2020.

-24-

ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

79.     Because Bragg had squandered and stolen Plaintiffs' funds, he needed another investor, so he turned to Jacky, one of John's friends. Jacky was presented with *yet another* set of operating agreements for the Moore Road LLCs. While these operating agreements were "variants" of the Unapproved Operating Agreements, they purported to give Jacky a preferred position to *any* equity investor, including Paramont. Believing his repayment was assured, Jacky invested $100,000 in the Moore Road Project. However, Bragg declined to share these new operating agreements with anyone at Paramont Woodside or Paramont Capital or with the other Plaintiffs.

### Bragg Demands Additional Loans from Plaintiffs

80.     Meanwhile, Plaintiffs did not receive a significant update about the Project until on or around March 23, 2020, when Bragg emailed them to say that he was monitoring the impact of COVID-19 on the Bay Area real estate market. Unbeknownst to Plaintiffs, six days earlier, on or around March 17, 2020, Genesis had contacted Bragg to say that their payments for the Moore Road Project were "past due and delinquent"—this despite the fact that Bragg had received a $100,000 cash infusion from Jacky in February. Bragg told Plaintiffs that he was seeking to refinance the loan for the Moore Road Project but "would need the financial support of all" of the investors. Bragg warned that the investors "will need to get a jump on this as the current loan [from Genesis] matures in June." He further said that given the demands of Genesis, "we w[ill] need financial help from all of you for an indefinite period." This included "$19,500 for mortgage payments . . . by the end of this month, and continuing months after this," an "extension fee with Genesis Capital . . . which is approximately $15,000," and whatever would be necessary to

ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

"[r]efinance the existing loan with Genesis or establish a new loan at lower rates with a more traditional lender."

81.     Plaintiffs dutifully stepped up to help fund these needs. On April 1, 2020, Plaintiffs loaned the following amounts to the Project: Bob $4,524, Mary $2,262, the Partnership $7,014, John $2,000; and on April 3, 2020, Jacky $1,500. Plaintiffs understood, and Bragg represented to them, that they would be repaid first for covering these "capital calls," which, if not paid promptly, would jeopardize the whole Project. Bragg assured Plaintiffs that they would receive 12% interest for these loans before any equity was repaid.

82.     Instead of using Plaintiffs' money to pay Genesis, Bragg used Plaintiffs' loans to pay Kludt. SVRV's bank records show that the day after Plaintiffs made their loans, Bragg transferred $19,500 to Kludt's holding company, ANA Holdings, LLC.

83.     Plaintiffs were never repaid their principal or any interest for these loans.

### Paramont Woodside Takes Control of the Project

84.     On or around April 30, 2020, Bragg emailed Bob, Martha, and Mary to raise "the difficult decisions we will need to start making in the coming days and weeks ahead." Bragg stated that SVRV had failed to find a buyer for the properties, and that extensions on the Project's loan from Genesis were set to run out in May 2020. Bragg stated that "it is likely that you will lose a significant portion if not all of your equity if you do not act now to help and protect the overall integrity of the project." Bragg recommended that the investors lower the sale price to $6,000,000. In Bragg's estimation, this would permit SVRV to pay back the lenders and associated fees and expenses, but "0.00" would remain "for anyone else."

-26-

ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

85.     **That was a lie**. As Bragg well knew, Paramont Woodside stood to reap a significant profit, even with a total sale price of $6,000,000 for the two properties, under the terms of the Unapproved Operating Agreements. Bragg also knew that he would obtain a hefty brokerage commission upon sale of the properties, even though the Moore Road Project had a primary broker, Colleen Marchbank, who sold the properties.

86.     Around this time, Martha wrote to Bragg to propose several solutions to the Project's financial straits. In addition to asking whether it would be possible to obtain a forbearance from Genesis, Martha asked whether Marchbank would be willing to help cover the Genesis payments until the properties could be sold for a higher price. Bragg responded in the negative, saying that her commission would not be lowered because "she's already committed to spend almost $10,000 to market this project" and "[s]he is our friend and has been working on this for almost a year already with potentially no exit in sight." Bragg did not disclose that he was serving as Marchbank's co-broker, *which entitled him to 50% of the seller's commission*. Further, unlike Marchbank, Bragg was not putting up any of his own capital to help market the Project.

87.     Bragg also told Plaintiffs that additional capital calls were needed ***to protect Bragg's personal credit***, as Bragg was the guarantor of the Genesis loan for the Moore Road Project. On information and belief, these loans were secured by more than $600,000 of Bragg's personal assets.[3] Yet Bragg never offered to put up his own money to cover the debt. This time, Plaintiffs refused to extend another loan.

---

[3] In August 2020, after being asked by Genesis to prove he had sufficient assets to renew SVRV's debt line, Bragg showed Genesis evidence of approximately $616,459 in personal financial assets.

-27-

88.     On or around May 4, 2020, Bragg wrote to Davis about the prospects from a $6,000,000 sale price for both properties. Bragg explained that there would be a $300,000 cost of sale for the buyers' and sellers' commissions (which would include a ***$75,000*** broker's fee for Bragg), $350,000 would be returned for Additional Capital Contributions, $360,000 would be returned to Paramont Woodside for its 12% preferred equity return, and the remainder of the available funds would be returned to Paramont Woodside for its Initial Contribution, with $0 remaining for anyone else.

89.     On or around May 5, 2020, Paramont Woodside elected itself Manager for the Project, replacing Bragg. Paramont Woodside informed Bragg that "[n]either you nor SVRV has any further right to bind [the Moore Road LLCs] in any manner, either orally or in writing." Paramont Woodside requested that Bragg and SVRV provide it with "copies of any documents or records pertaining to [the Moore Road LLCs]" "immediately."

90.     Bragg never notified Plaintiffs that Paramont had taken over management of the Project in which Plaintiffs had cumulatively invested and loaned over $1 million.

91.     Apart from taking over management of the Moore Road LLCs, on or around May 12, 2020, Paramont Woodside amended the Unapproved Operating Agreements to grant itself a 15% preferred return—up from a 12% preferred return—before any other investors would be repaid. Paramont Woodside also retroactively declared that Plaintiffs' loans made to cover the Genesis capital calls would not be treated as debt, entitled to priority return under the Unapproved Operating Agreements—nor even as Additional Capital Contributions entitled to secondary reimbursement under the Unapproved Operating Agreements—but instead would be treated as part of the Subsequent Capital

-28-

Contribution that SVRV had purportedly failed to make by February 1, 2019. This meant that Plaintiffs' recent loans—made for the express purpose of paying the Genesis debt to prevent foreclosure with the promise of a 12% return and prioritized repayment—would be subordinated to Paramont Woodside's initial investment and preferred return. **Bragg signed this amendment**, *both* as the Manager of SVRV *and* in his individual capacity, but he never notified Plaintiffs of this amendment.

92.     Even though Paramont Woodside replaced Bragg as the Manager of the Moore Road LLCs, Paramont Woodside let Bragg continue to work on the Project and stay on as a broker, even though Marchbank was doing all the work. Davis and Wolfe acknowledged internally that this was improper. There was no business justification for allowing Bragg to serve as Marchbank's co-broker; the only reason for making Bragg a co-broker was to enable him to personally receive additional remuneration in the form of a $75,000 broker's fee.

93.     In other words, Bragg conspired with Paramont Woodside to ensure that they would each profit from the sale of the Moore Road properties while the Plaintiffs would be left with nothing.

94.     On or around May 26, 2020, Genesis wrote to Bragg to inform him that their loan for the Project had been extended. Davis authorized them to approve the extension. No one informed Plaintiffs of these events, including the unfavorable terms of the loan extension.

ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

## **The Properties Are Sold for $6 million but Plaintiffs are Left with Nothing**

95.     387 Moore Road sold on September 9, 2020, for $2,700,000,[4] and 385 Moore Road sold on October 5, 2020, for $3,300,000.[5]

96.     When the properties sold, Bragg took a $75,000 commission.

97.     Paramont Capital paid itself a $76,244 management fee, and Paramont Woodside received its initial $2,000,000 investment plus a return of approximately $248,572.

98.     On or around October 17, 2020, as Paramont, Davis, and Bragg worked to close out the Moore Road Project and pay the outstanding invoices that Bragg had ignored for the preceding three years, Bragg wrote to Wolfe to complain that he should not have to pay the outstanding invoices when Paramont Woodside was walking away with a substantial return and SVRV had "lost the entirety of somewhere between $700,000 and $800,000" (an understatement, including because Bragg did not reveal to Paramont that he had purported to grant Jacky a superior equity position in 2020 to secure $100,000 from him). Davis wrote to Wolfe, stating that SVRV "didn't lose $700K – [its] investor[s] lost $700K. [Bragg is] probably making money on this deal with the commissions [he] received." "[Bragg] just pulled almost $100,000 in commissions out of this closing that didn't need to happen and really shouldn't have happened."

99.     Although the sale of the Moore Road properties netted $6,000,000—a sum that, despite being lower than it should have been, far exceeded the $4,500,000 that SVRV

[4] https://www.redfin.com/CA/Woodside/387-Moore-Rd-94062/home/161295986.
[5] https://www.redfin.com/CA/Woodside/385-Moore-Rd-94062/home/161246892.

-30-

ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

paid for the properties—none of the Plaintiffs received *any* funds following the sale. As Paramont Woodside wound up the Project, Wolfe wrote to Bragg, "remember the main issue on our side is your agreement that nothing further is due to your investor[s]."

100. On or around November 13, 2020, Paramont Woodside again amended the Unapproved Operating Agreements. In this amendment, "Bragg and SVRV represent[ed] and warrant[ed] to Paramont [Woodside] and the [Moore Road LLCs] that no amounts are owing by either of the [Moore Road LLCs] to any third parties"—including Plaintiffs—except certain designated amounts to various vendors.

101. The amendment also stated that after Bragg and SVRV made payments to satisfy the referenced amounts, "Paramont [Woodside] will be entitled to all other funds held by the [Moore Road LLCs] and that neither Bragg nor SVRV is entitled to any further distributions of any nature from either of the [Moore Road LLCs]." Once again, Bragg signed this amendment both as Manager of SVRV and in his individual capacity. Once again, no one notified Plaintiffs of this purported amendment.

**Bragg Refuses to Speak with Plaintiffs About the Moore Road Project**

102. When the Moore Road properties sold, Bragg did not even notify John and Jacky. They had to discover this information online and reach out to Bragg about their investments, which they did not know had been stolen and squandered.

103. Then, for over a year following the sale of the Moore Road properties, Bob and John tried repeatedly to obtain information from Bragg about the Moore Road Project's finances. Bob and John also inquired about the amounts invested in the Project by each investor and other money invested in the Project to determine who should be paid and how

much. Bob also inquired about repayment of, and interest on, his personal loan of $100,000 from March 2019.

104.   Bragg refused to respond to Bob's and John's inquiries. On or around January 7, 2021, for example, Bob again requested an accounting for the Moore Road Project, sought repayment of his loan, inquired about closing the IRA account that had been opened for the Project to avoid being charged service fees on an empty account, and asked for documentation regarding the Project for tax purposes. Bragg responded that he was "working on responses and information to share with your IRA and tax professionals," but he refused to respond to any of Bob's other inquiries.

105.   On or around February 12, 2021, Bob had to follow up again about his now-empty IRA account, which he needed SVRV's help to close. Bob again informed Bragg that he had been charged an annual maintenance fee on this now-empty account, and he asked SVRV to complete the required forms as soon as possible to close the account. He stated, "I have suffered a great loss and do not need to keep bleeding." Bob also again requested an accounting for the Moore Road Project and requested repayment of his $100,000 loan. Bragg waited five days, and then responded to say only, "I received both of your emails and the attachments. I spoke with [Kludt] yesterday, and we will get you something [for your IRA account] before the deadline." Bragg submitted an insufficient letter to close Bob's now-empty IRA account on February 24, 2021, but he once again refused to respond to any of Bob's other inquiries.

106.   On or around February 25, 2021, Bragg provided Bob with certain of the Paramont Defendants' "internal records" for the Moore Road Project. Bragg did not provide any of SVRV's records.

107.   Also among the documents were the two May 5, 2020, letters from Paramont Woodside regarding its decision to replace Bragg as Manager of the Project. Plaintiffs thus learned for the first time—four months *after* the properties were sold—that Paramont Woodside had replaced Bragg as Manager of the Project.

108.   In the following months, Bob continued to request an accounting for the Moore Road Project and repayment of his $100,000 loan, but Bragg refused to respond.

109.   On or around May 28, 2021, Bob finally threatened legal action. Bragg did not provide a substantive response until on or around June 3, 2021, when he claimed that he had "been having difficulty finding the emails specifically about the part of your additional investments into the [Moore Road] project."   He refused to address Bob's request for an accounting for the Moore Road Project. Regarding Bob's $100,000 loan, Bragg claimed: "From memory you and your family provided an additional $200,000, $100,000 was from your family trust and was a placeholder while we raised additional funds. The other $100,000 was money that you put up while you waited for other investments in SVRV became [sic] liquid. We were able to raise the capital for your family trust and returned the $100,000. Unfortunately, your other investments with SVRV did not yield what was expected and we returned the only funds that we had and from memory, it was only around $3500."

-33-

110.    That explanation was a lie, contradicted by SVRV's own internal documents and Bragg's statement to Bob that his original SVRV investment had been profitable such that $205,000 was to be rolled over into the Moore Road Project. Bragg's email continued, "At this point in time, SVRV is essentially out of business, and barring a last miracle you along with me and a few other investors have a total loss." This too was a lie, as Bragg did not have a "total loss." On the contrary, he never invested any money in the Project and yet made a $75,000 broker's fee in addition to the amounts he paid himself for his alleged time spent on the Project.

111.    After silence from Bragg, Bob followed up again on or around June 15, 2021. He informed Bragg that his $100,000 loan had been for the Moore Road Project only—not for any other SVRV investment. He reminded Bragg that at the investor meeting in March 2019, Bragg had specifically stated that SVRV needed an additional $200,000 from the investors to show Paramont that there was enough money in the Project, and that this $200,000 would be promptly returned. Bob reminded Bragg that he had written a $100,000 check shortly after this meeting, on March 19, 2019, for this purpose. Bob provided Bragg with a photo of his bank book showing a check for "SVRV/MOORE RD" in the amount of $100,000 on March 19, 2019. Bragg refused to respond.

**Bragg Defaults in the _Arntsen_ Litigation and One of His Co-Defendants Settles**

112.    Plaintiffs filed their complaint against Bragg in _Arntsen_ on March 15, 2022. Exhibit A. The Complaint asserted claims for, _inter alia,_ (1) fraud, intentional misrepresentation, false promise, (2) fraudulent concealment, and (3) breach of fiduciary

-34-

duties. Bragg failed to answer the Complaint and the Court entered a default against Bragg on June 29, 2022. Exhibit B.[6]

113.　Plaintiffs filed an amended complaint in *Arntsen* on August 22, 2022. Exhibit C. Instead of answering the amended complaint, Bragg filed the bankruptcy petition in this case.

114.　In November 2022, Plaintiffs settled their claims with Kludt for $450,000. The Court approved the settlement on December 14, 2022.

### Bragg Continues to Lie in These Bankruptcy Proceedings

115.　Bragg's fraudulent behavior has continued in these bankruptcy proceedings. Bragg described the *Arntsen* action as a "breach of contract" action in his bankruptcy petition despite knowing that it is a fraud action. Bragg failed to disclose John's and Jacky's claims in his petition altogether, even though Plaintiffs notified Bragg of their intent to file a Second Amended Complaint adding their claims.

116.　In his petition, Bragg also failed to disclose all his liabilities and assets (including vehicles, construction equipment, major appliances, and much more).

117.　Bragg has also repeatedly made false statements under oath in these proceedings. To give just one example, he denied repeatedly at the last meeting of creditors on December 5, 2022 that SVRV ever owned a Hummer, even though on March 13, 2018,

---

[6] Plaintiffs did not file a motion for default judgment against Bragg because they were seeking joint and several liability against Bragg and his co-defendants, and California law prohibits entry of a default judgment in that situation without dismissing the other defendants or applying for separate judgment against each defendant, which was not possible at the time. Cal. R. Ct. 3.1800(a)(7).

ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

in response to an email from one of his contractors saying that SVRV should not purchase a Gator because it would be "a vanity expense and mostly a toy, just like the Humvee," Bragg wrote that he "agree[d] the Hummer was a wanted not a needed item" (but continued, "Gator is already bought").

## COUNT I

### (NONDISCHARGEABLE DEBT FOR MONEY OBTAINED BY FALSE PRETENSES, FALSE REPRESENTATIONS OR ACTUAL FRAUD 11 U.S.C. § 523(a)(2)(A))

118.   Plaintiffs repeat and reallege the allegations in ¶¶ 1 through 117.

119.   Bragg solicited investments and loans from Plaintiffs through fraud and blatant misrepresentations:

120.   He told Bob and Martha in December 2017 that Bob's investment in SVRV Land was profitable in order to induce further investments in the Moore Road Project. That was false. The SVRV Land project was a dismal failure, and most of Bob's initial investment was lost. Had Plaintiffs known that the SVRV Land deal was *not* profitable, they never would have invested in the Moore Road Project or loaned Bragg any money. Bragg intended that Plaintiffs would rely on his misrepresentation, and they did rely on it to their detriment. As a result of Bragg's willful misrepresentation, Bob, the Partnership, Mary, and the Custodianship were defrauded out of more than $700,000.

121.   Bragg presented Bob, the Partnership, Mary, and the Custodianship with the Effective Operating Agreements, which reflected that their ownership in the Moore Road LLCs would be commensurate with their investments. Bragg presented John with other

-36-

ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

operating agreements that were themselves invalid, but which still did not authorize Bragg to sign the Unapproved Operating Agreements.

122. Yet, Bragg did subsequently sign the Unapproved Operating Agreements with Paramont that purported to deprive Plaintiffs of *any* ownership interest.

123. Bragg also presented Jacky with a *further* revised version of the Unapproved Operating Agreement that purported to grant Jacky superior equity rights even to Paramont, but hid this from both Paramont and Bob, the Partnership, Mary, and the Custodianship.

124. Bragg subsequently allowed Paramont Woodside to take over management of the Moore Road LLCs, liquidate the property, and pocket the profits while completely wiping out Plaintiffs' investments, including by amending the Unapproved Operating Agreements to grant themselves an even greater preferred return. Bragg presented Bob, the Partnership, Mary, and the Custodianship with the Effective Operating Agreements; John with his own operating agreements; and Jacky with revised Unapproved Operating Agreements with the intention that they would rely on them, and Plaintiffs did in fact rely on those agreements to commit nearly $1 million in capital between June 2018 and March 2020. Bragg subsequently deprived them of any ownership in the properties, which defrauded them of all capital invested in or loaned to the Project.

125. Bragg told Plaintiffs at multiple investor meetings that their investments would be used to fund the Moore Road Project. However, documents produced in the *Arntsen* case have revealed that Bragg misdirected Plaintiffs' funds into SVRV's and SVREV's accounts, where they were then used to fund *other* projects in which Bragg had a financial interest and to personally enrich Bragg. Bragg intended that Plaintiffs would

ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

rely on his misrepresentations, and they did in fact rely on them to their detriment. As a result of Bragg's misuse of funds for other projects and for personal enrichment, Defendants were defrauded out of hundreds of thousands of dollars.

126.    Bragg solicited $200,000 in loans from Bob and the Partnership in March 2019 by falsely claiming that he needed those funds to induce Paramont to invest in the Moore Road Project. That was a lie, as Paramont had already invested $2,000,000 in the project over four months before Bragg solicited the loans. In fact, Bragg wanted the money to cover expenses for *other* projects that Bragg (but not Plaintiffs) had invested in. Bragg subsequently refused to repay Bob his principal or interest and refused to repay the Partnership its interest. Bragg intended that Plaintiffs would rely on his misrepresentation, and Plaintiffs did rely on it. As a result, Bob was defrauded out of nearly $140,000 in principal and interest, and the Partnership was defrauded out of thousands in interest.

127.    Bragg solicited additional loans from Plaintiffs in March 2020 by telling Plaintiffs their funds were needed to pay the mortgage owed to Genesis. However, Bragg immediately transferred the funds from Plaintiffs to his business partner. Bragg also told Plaintiffs that they would receive priority repayment with 12% interest once the Moore Road properties were sold. However, he subsequently agreed with Paramont Woodside that Plaintiffs would receive *no repayments* from the proceeds of the property sales. Bragg intended that Plaintiffs would rely on his misrepresentation regarding the use of their funds and their right to repayment, and Plaintiffs did in fact rely on it. As a result, Plaintiffs were defrauded out of nearly $25,000 in principal and interest.

ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

128.    The total amount of money Bragg obtained from Plaintiffs by such false pretenses, false representations, or actual fraud is at least $1 million. Plaintiffs are also entitled to punitive damages for Bragg's willful and reckless conduct.

129.    Consequently, Bragg's debt to Plaintiffs is one for money, property, or services obtained by false pretenses, false representations, or actual fraud, and is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

## COUNT II

### (NONDISCHARGEABLE DEBT FOR MONEY OBTAINED BY FRAUD OR DEFALCATION WHILE ACTING IN A FIDUCIARY CAPACITY, EMBEZZLEMENT, OR LARCENY
### 11 U.S.C. § 523(a)(4))

130.    Plaintiffs repeat and reallege the allegations in ¶¶ 1 through 117.

131.    Plaintiffs invested hundreds of thousands of dollars into the Moore Road LLCs. Under the terms of the Effective Operating Agreements, Plaintiffs owned a percentage of each LLC based on their level of investment. Bragg was the manager of both LLCs from the time they were founded until Paramont Woodside replace Bragg as manager in May 2020. Bragg thus owed fiduciary duties to Plaintiffs.

132.    Bob also invested more than $150,000 in SVRV with the promise of a 50% preferred return. Bragg was the managing member of SVRV from its incorporation until its ultimate dissolution in 2021.

133.    Bragg violated his fiduciary duties of loyalty and care by repeatedly diverting funds from the Moore Road LLCs and SVRV for personal use. Bragg spent investor money on exorbitant rent, fancy cars, a boat, a private jet membership, direct payments to himself

ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

and his family, and more. He also diverted hundreds of thousands of dollars designated for the Moore Road Project to other projects in which he had a personal financial interest.

134.   Bragg also committed fraud or defalcation while acting as a fiduciary, embezzlement or larceny, when he solicited $200,000 in loans from Bob and the Partnership ostensibly for use by the Moore Road Project, but diverted those funds to the SVRV 631 Beach project.

135.   Bragg further committed fraud or defalcation while acting as a fiduciary, embezzlement or larceny, when he solicited over $17,000 in short-term loans from Plaintiffs to cover the capital calls from Genesis and then immediately transferred those funds to his business partner.

136.   As a result of Bragg's embezzlement, fraud, and defalcation while acting in a fiduciary capacity, Plaintiffs were deprived of more than $1 million.

137.   Consequently, Bragg's debt to Plaintiffs is for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny, and is excepted from discharge under 11 U.S.C. § 523(a)(4).

## COUNT III

### (NONDISCHARGEABLE DEBT FOR WILLFUL AND MALICIOUS INJURY BY THE DEBTOR TO PLAINTIFFS 11 U.S.C. § 523(a)(6))

138.   Plaintiffs repeat and reallege the allegations in ¶¶ 1 through 117.

139.   Bragg, acting as the alter ego of SVRV, signed a written contract with Bob in 2015 that promised a 50% preferred return on his investment of $152,500. Instead of honoring that contractual promise, Bragg deliberately breached the agreement and refused

-40-

to return Bob's principal or the interested owed. This breach was accompanied by tortious conduct resulting in willful and malicious injury. Specifically, Bragg misappropriated funds Bob invested in SVRV to enrich himself. Although Bob's investment in SVRV was designated for various real estate projects, Bragg used SVRV's funds to pay rent on his personal residence, lease his personal cars, pay for membership in a private jet service, and write checks to his personal accounts. As a result of Bragg's outrageous and unethical conduct, SVRV was unable to repay Bob his initial investment, along with the promised interest.

140.    Bragg, acting as an alter ego of SVRV and the Moore Road LLCs, formed an oral agreement with Bob and the Partnership in 2019 when he solicited $100,000 loans from each of them. Bragg promised that the loans would be given priority over all other investments and that the loans would be repaid with 12% interest. Bragg breached that oral contract by refusing to return Bob's principal and by failing to pay any interest to either Bob or the Partnership. This breach of contract was accompanied by tortious conduct resulting in willful and malicious injury. Specifically, Bragg never informed Paramont Woodside about the terms of the loans even though he had secretly signed Unapproved Operating Agreements giving Paramont the right to take over management of the Moore Road LLCs, which they did in early 2020. Moreover, Bragg did not use the loan proceeds for the purposes represented to Bob and the Partnership. Although Bragg told Bob and the Partnership that the proceeds were necessary to secure an investment from Paramont, the proceeds were in fact used to pay for closing costs associated with an entirely different

ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

project. As a result of Bragg's outrageous and unethical conduct, Bob was never repaid his principal or promised interest, and the Partnership was never repaid its promised interest.

141.   Bragg, acting as the alter ego of SVRV and the Moore Road LLCs, formed an oral contract with Plaintiffs in 2020 when he solicited over $17,000 in loans to cover a monthly mortgage payment to Genesis. Under the contract, Plaintiffs' loans were to be repaid ahead of all other funds invested or loaned to the Project once the properties were sold, along with 12% interest. Bragg breached the terms of that contract and failed to repay Plaintiffs their principal or any of the promised interest. This breach of contract was accompanied by tortious conduct resulting in willful and malicious injury. Specifically, Bragg deliberately withheld from Plaintiffs the fact that Paramont Woodside would imminently be taking over the Moore Road LLCs. He further failed to tell Paramont Woodside of the terms of the contracts he had signed on behalf of the Moore Road LLCs, or of the contracts he had entered into orally. He subsequently agreed with Paramont Woodside that Plaintiffs would receive no proceeds from the sale of the properties. As a result of Bragg's outrageous and unethical conduct, the Moore Road LLCs never repaid Plaintiffs their principal or promised interest.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request that the Court:

A. Determine and declare that Debtor's debts to Plaintiffs—including compensatory damages, punitive damages, prejudgment interest, and costs—arising from their investments in and loans to the Moore Road Project and SVRV are nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6).

ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

B.  Enter judgment against Debtor in the amount of $703,373.06 in compensatory damages, prejudgment interest, and costs (which amount reflects Plaintiffs' total investment and loan principal for the Moore Road Project plus applicable interest accrued through October 21, 2022 and costs billed to plaintiffs through November 2022, less the value of the settlement with Kludt); prejudgment interest and costs that continue to accrue; attorneys' fees; and $2,000,000 in punitive damages.

C.  Grant Plaintiffs such other and further relief as this case may require and the Court deems just and proper.

Dated:  December 22, 2022                    /s/ *Collin James Vierra*

Collin James Vierra

*Attorney for Plaintiffs Robert Arntsen, Mary Lee, Arntsen Family Partnership, LP, Brian Christopher Dunn Custodianship, John Ho and Quanyu Huang*

ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT